UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION

| | |
|---|---|
| **CEB INVESTMENTS, LLC** | **PLAINTIFF** |
| v. | No. 5:22-cv-162-BJB |
| **NATIONWIDE PROPERTY AND CASUALTY INSURANCE COMPANY** | **DEFENDANT** |

\* \* \* \* \*

### MEMORANDUM OPINION AND ORDER

This case concerns an unusual situation with a sensible resolution. A property owner agreed to sell a building, the buyer paid some but not all of the purchase price, a tornado destroyed the building, and both buyer and seller maintained insurance coverage. Who owes what to whom? The answer is simpler that might be expected, at least when (as here) one insurer already paid on a claim and the buyer already paid the balance it owed to the seller: nobody owes anything to anyone. Under Kentucky law, an insured property owner may not recover anything more than its "financial interest" in the property—the amount remaining due on the sales contract. In other words, it can't overinsure or double recover. So if the amount due on the contract is zero, the insurer needn't pay anything else. That means the seller here (CEB Investments) may not recover against its insurer (Nationwide) for any additional loss or breach of the insurance policy. And because its breach claim fails, its bad-faith insurance claim (previously bifurcated by the Magistrate Judge) necessarily fails, too.

The devastating tornado of December 2021 destroyed vast swaths of property—including the would-be gym on 6th Street in Mayfield. Its destruction added to the untold millions in losses suffered by citizens and property owners—but it ultimately didn't cost CEB Investments anything, at least not after it received its sales price a few months after the tornado hit. The buyer's insurance, and then the buyer itself, made the seller whole. Lacking any other evidence of breach or loss, summary judgment is due Nationwide, but not CEB.

### A. Factual Record at Summary Judgment

In September 2021, CEB agreed to sell a building at 219 N. 6th Street in Mayfield, Kentucky to a company called Ultimate Fitness. *See* Land Sale Contract (DN 48-2). Ultimate agreed to buy the property for $125,000, plus interest, to be paid

1

in monthly installments over a 15-year period. *Id.* at 1–2. It planned to operate a gym on the property. *See* Thomas P. Winter Dep. (DN 45) at 8:17–11:19.

But mother nature intervened. Just a few months later, a series of historically devastating tornadoes ravaged Southwest Kentucky (as well as Southeast Missouri and Northwest and Central Tennessee). *See generally* NATIONAL WEATHER SERVICE, DECEMBER 10–11, 2021 TORNADOES, https://www.weather.gov/lmk/December 112021Tornadoes. The storm leveled large swaths of the region, including the 6th Street property. *See* Winter Dep. at 24:20–22. At the time, Ultimate owed CEB around $113,000 on the contract. *Id.* at 32:21–23.

Building destroyed, the parties filed claims with their respective insurers. CEB had a policy with Nationwide, which stated that, in the event of loss, Nationwide would pay CEB no more than CEB's "financial interest" in the property. Policy (DN 48-3) at Page ID 709; *see* K.R.S. § 304-14.060(1) (measuring financial interest "as at the time of the loss"). This is consistent with the default rule/limit under Kentucky law: apparently to avoid a form of speculation, property may be insured only up to the value of the owner's interest in it. *See* K.R.S. § 304-14.060; *Delk v. Markel Am. Ins. Co.*, 81 P.3d 629, 633–35 (Okla. 2003) (the "foremost historical justification" for the rule is to "prohibit wagering contracts in the guise of insurance"). Ultimate had its own policy with West Bend Insurance Company. Winter Dep. at 21:1–7.

Nationwide initially issued CEB a check for around $288,000. Nationwide Check (DN 48-4). But before CEB received the check, Ultimate notified CEB that *its* insurer—West Bend—refused to process Ultimate's claim while CEB's claim was also pending. Winter Dep. at 33:9–14; Christopher Burnett Dep. (DN 46) at 78:1–14. West Bend apparently estimated Ultimate's loss as greater than CEB's expected payout from Nationwide. *See* Burnett Dep. at 75:15–18 ("It would have been very foolish for me to have knocked him out of a $385,000 check when mine was $285,000 or whatever it was."). From that, CEB inferred that if only one claim could proceed, it should be Ultimate's. *Id.* at 79:22–24. So CEB withdrew its claim with Nationwide,[1] and Nationwide stopped payment on CEB's check. *See* 2021 CEB-Nationwide Email Traffic (DN 48-6). West Bend then issued a check for $388,000 and change in late December, payable to both Ultimate and CEB. DN 48-7. Each endorsed the check, and Ultimate's representative deposited it in the Ultimate bank account on January, 3, 2022. Gary McClain Dep. (DN 47) at 85:7–87:6.

For reasons that are neither entirely clear nor necessarily relevant, CEB didn't receive any funds from the West Bend check during the following weeks. So in mid-January, CEB's general counsel reached out to Nationwide, requesting the status of its previously closed claim. 2022 CEB-Nationwide Email Traffic (DN 48-8) at 6–7.

---

[1] The parties dispute whether CEB meant this withdrawal to be temporary or permanent. But all agree that CEB's insurance agent emailed Nationwide to withdraw the claim.

After a couple weeks of back-and-forth, Nationwide (at CEB's request) formally reopened CEB's claim for the 6th Street property on February 1. *Id.* at 3; CEB Demand Letters (DN 49-9) at 1. Nationwide responded on February 10 that it owed nothing because West Bend had already paid a claim for the same building. 2022 CEB-Nationwide Email Traffic at 1. CEB followed up twice in mid-March, arguing that Nationwide owed it around $210,000 above and beyond the West Bend payout. CEB Demand Letters at 2–4.

A few days later, CEB and Ultimate entered a "buyout agreement": Ultimate agreed to pay the outstanding balance of about $115,000 on the original purchase contract in two installments—one that month and another in April.[2] Buyout Agreement (DN 49-12). By April 11 Ultimate had paid CEB in full. Winter Dep. at 61:20–23; Burnett Dep. at 137:4–6. Nationwide followed up with a May 2 letter (DN 48-10) explaining that, because CEB had recovered its "insurable interest" in the property, "no further payments are owed under th[e] policy."

### B. This Litigation

CEB disagreed that the insurance policy left nothing for it to recover. So it sued Nationwide in Graves Circuit Court, bringing claims for breach of contract, violations of the Kentucky Unfair Claims Settlement Practices Act, and insurance bad faith. Complaint (DN 1-2) ¶¶ 37–52. Nationwide removed to this Court, and following discovery the parties have each sought summary judgment against the other on the breach claim.[3] Nationwide's MSJ (DN 48); CEB's MSJ (DN 49). Their dueling arguments concern the same basic question: is CEB entitled to any payout from Nationwide under the terms of the insurance policy?

CEB's position regarding Nationwide's breach has changed during the dispute. Before this litigation, CEB sought a pro rata payment of about $210,000 from Nationwide to supplement the payment from West Bend. *See* CEB Demand Letters at 2–4. The source of that purported obligation was the policy's "other insurance clause."[4] CEB's MSJ Opp. (DN 50) at 3. Once litigation began, however, CEB asserted that Nationwide owed it the "full policy limits"—a figure it calculated to be about $288,000. CEB's MSJ at 2, 6. CEB conceded during the summary-judgment hearing, however, that the most it could recover from Nationwide on its contract claim is CEB's "interest in the property under Kentucky law." *See* CEB Answers to

---

[2] The Buyout Agreement submitted by CEB at DN 49-12 is unsigned, but neither side disputes that the parties executed its terms.

[3] The Court bifurcated the breach and bad-faith claims. DN 11.

[4] CEB no longer claims an entitlement under that clause.

3

Interrogatories (DN 48-11) (listing these three recovery options as alternatives). So the amount it currently seeks is not nil but not specified.[5]

### C. Summary Judgment Is Due Nationwide Because CEB Hasn't Supported Its Breach Claim with Record Evidence.

The law of insurance in Kentucky applies the so-called "insurable interest rule." That rule renders insurance contracts enforceable only "for the benefit of persons having an insurable interest in the things insured as at the time of the loss." K.R.S. § 304-14.060(1). An "insurable interest," in turn, is defined as "any actual, lawful, and substantial economic interest in the" property. K.R.S. § 304.14-060(2). This is consistent with the parties' contract, which stated that Nationwide was only on the hook for CEB's "financial interest" in the property.

What was CEB's "insurable interest" at the time of the loss? Ultimate and CEB entered into a land contract—essentially a mortgage given by the seller to the buyer. *See* Winter Dep. at 12:8–10 (CEB would "hold the mortgage on [the property] instead of [Ultimate] having to go to a bank."). "When a typical installment land contract is used as the means of financing the purchase of property, legal title to the property remains in the seller until the buyer has paid the entire contract price … at which time the seller tenders a deed to the buyer." *Sebastian v. Floyd*, 585 S.W.2d 381, 382 (Ky. 1979). "[E]quitable title," however, "passes to the buyer when the contract is entered." *Id.* And during the repayment period, the seller "holds nothing but the bare legal title, as security for the payment of the purchase price." *Id.* (citing *Henkenberns v. Hauck*, 236 S.W.2d 703 (Ky. 1951)). Ultimate took equitable title as soon as the parties executed the loan contract, while from that point on CEB retained only bare legal title.

Transfer of equitable title has implications for each side's insurable interest. The buyer, as equitable owner, bears "the risk of loss o[r] destruction of the property pending completion of the sale." *Estes v. Thurman*, 192 S.W.3d 429, 432 (Ky. Ct. App. 2005) (citing 27A Am. Jur. 2d, *Equitable Conversion* § 13 (1996)). That means their "insurable interest" is the full replacement or repair value of the property. The seller, by contrast, as legal owner, is entitled under Kentucky law and general property-law principles, to only "the unpaid balance of the purchase price" in the event of a loss. *Id.* at 432–33 (citing *King v. Dunlap*, 945 S.W.2d 736 (Tenn. Ct. App. 1996)); *see also* 3 COUCH ON INSURANCE § 42:63 (2024) ("The conditional vendor who has retained title has an insurable interest to the extent of the purchase price remaining unpaid ….").

---

[5] Perhaps the current contract damages request is as little as the time-value of money between the initial claim and the Ultimate payout, as discussed during the summary-judgment hearing—though that number and even that theory are absent from CEB's papers. Regardless, CEB appears more concerned with the prospects of its bifurcated bad-faith claim at this point.

This means CEB's insurable interest was its financial interest in the property—the unpaid balance of the purchase price. As "the vendor," it "[held] the legal title as security *for the payment of the purchase money*." 17 WILLISTON ON CONTRACTS § 50:42 (4th ed.) (emphasis added)). Ultimate, as equitable owner, was "entitled to the usual benefits attaching to the ownership of the property, subject, however, to the rights of [CEB]." *Id.*

CEB conceded as much at oral argument: "regardless of who paid," its recovery was limited to its financial interest in the property. That interest was the unpaid balance of the contract—not, as CEB suggests, the "full value of the building before it was destroyed." CEB's MSJ at 9. And, as all agree, Ultimate paid that balance with two installments in March and April of 2022. Thus, under the terms of the policy and Kentucky law, CEB has received compensation for its interest in the 6th Street property—albeit for its sale rather than for its destruction—and can recover no more from Nationwide.

So what remains in controversy? CEB has a bifurcated claim for unfair claims settlement waiting in the wings, but that cannot proceed absent a finding of breach by Nationwide. *See Davidson v. American Freightways, Inc.*, 25 S.W.3d 94, 100 (Ky. 2000) ("Absent a contractual obligation, there simply is no bad faith cause of action, either at common law or by statute."). And CEB still contends that Nationwide breached by failing to pay out *immediately* after CEB submitted its initial claim in December or its reinstituted claim in late January. *See* CEB's MSJ Opp. at 7–10.

CEB, of course, withdrew the first claim shortly after filing. *See* Letter from CEB's Insurance Agent to Nationwide (DN 48-5) at 1 ("Chris Burnett the owner of CEB investments … would like to withdraw the claim …."). And CEB doesn't contend Nationwide was obliged to pay a claim despite the policyholder's withdrawal. CEB has offered no theory of proof that Nationwide breached by not paying the initial claim during the very brief period before its withdrawal.

What about the period after CEB renewed its claim in February? CEB reinstituted its claim on February 1 and says it should've received an additional sum from Nationwide. But by then Nationwide had already sent CEB a check (which CEB asked Nationwide to cancel), West Bend had already sent Ultimate *and* CEB another check for nearly $400,000 in late December (which CEB endorsed but never deposited), and Ultimate paid CEB the $113,000 remainder of the purchase price in March and April (as CEB agreed by contract). Having recovered the whole of its insurable interest, what more does CEB contend it should've been paid, and how much sooner? It never really says—so it would be difficult for a court to frame a summary-judgment award in its favor. Even construing CEB's position generously, the only *damage* caused by Nationwide's nonpayment is just the time value of money between December—the time of the initial claim—and April—when Ultimate paid off the balance. And CEB has never raised that theory of loss.

True, CEB points to four "factual disputes" regarding Nationwide's payment obligations. CEB's MSJ Opp. at 2. But insofar as the disputes are "genuine," FED. R.

Civ. P. 56(a), they are immaterial because their resolution by a jury would not "affect the outcome of the suit," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

CEB first asserts that when Nationwide issued the initial (later-canceled) check to CEB, Nationwide knew that the property was "subject to a contract between CEB and Ultimate Fitness." CEB's MSJ Opp. at 2. Nationwide was under the mistaken impression that Ultimate was CEB's tenant. Nationwide's Reply (DN 51) at 2.[6] But any misunderstanding has no effect on the fact that CEB's recovery is limited to its insurable interest,[7] and CEB has recovered that interest.

The other three purported disputes pertain to another apparent misunderstanding, this one between CEB and Ultimate: did Ultimate intend to pay off its loan contract once it received its payout from West Bend? If so, when? CEB's MSJ Opp. at 4–6. But that's (at most) a dispute between buyer and seller—not between insurer and policyholder. Any alleged bad behavior from *Ultimate* wouldn't matter to *Nationwide's* obligations under the terms of its policy.

That leaves CEB's claim that Nationwide breached its notice obligations under the insurance policy. *Id.* at 10. According to CEB, Nationwide was obliged to "give notice of [its] intentions within 30 days after [it] receive[d] the sworn proof of loss" of the insured property. Policy at Page ID 709. CEB argues (at MSJ p. 11) that Nationwide breached this notice requirement by failing to communicate in early 2022 after CEB formally reopened its claim.

CEB misreads this provision. A plain reading of the contract's language is that Nationwide's notice requirement is triggered by receipt of "sworn proof of loss" from CEB. But as counsel for Nationwide stated at oral argument (and counsel for CEB didn't expressly dispute), there has never been a sworn proof of loss submitted in this case. Without sworn proof of loss, no obligation for Nationwide to provide "notice of [its] intentions" regarding that loss ever arose.

The absence of a sworn proof of loss, moreover, appears unsurprising. Under the policy's terms, CEB's obligation to provide a sworn proof of loss appears contingent upon a "request" for "information" from Nationwide so that it can "investigate the claim." Policy at Page ID 709.[8] That is, "[t]he policy in this case requires Plaintiff to submit a proof of loss claim only in response to Defendant's

---

[6] This misunderstanding likely explains why Nationwide's initial payout of $288,000 was considerably higher than CEB's insurable interest in the property. Had CEB been Ultimate's landlord, it would've retained both legal and equitable title to the property, meaning its insurable interest was the building's full value.

[7] CEB is not, for example, arguing that it detrimentally relied on Nationwide's initial $288,000 payout, later canceled, such that it would now be inequitable for Nationwide not to follow through on it. *Cf. Sawyer v. Mills*, 295 S.W.3d 79, 89–90 (Ky. 2009) (discussing promissory and equitable estoppel).

[8] To open a claim, CEB needed only to provide Nationwide "prompt notice of the loss" and include "a description of the property involved." Policy at Page ID 709, ¶ 3(a)(2).

request for a proof of loss to be filed." *Pinnacle Bank as Trustee of Ransom Family Trust v. Fidelity & Deposit Co. of Maryland*, 598 F. Supp. 3d 666, 674 (M.D. Tenn. 2022) (interpreting identical policy language); *Kokak LLC v. Auto-Owners Insurance Co.*, No. 2:18-cv-177, 2021 WL 3053209, at *11 n.21 (N.D. Ind. July 20, 2021) (interpreting identical language and holding that "the Policy is very clear that the Proof of Loss only needs to be submitted sixty days after it is requested"). And no evidence of such a request from Nationwide appears in the record. CEB has offered no evidence or precedent suggesting that the 30-day notice provision applies even without a sworn proof of loss.

None of CEB's caselaw contradicts this. Two decisions addressed evidence of a sworn proof of loss absent here. *See Nationwide Mutual Insurance Co. v. Nall's Newton Tire*, No. 14-cv-110, 2015 WL 8207478, at *4 (S.D. Ala. Dec. 7, 2015) ("A copy of NNT's proof of loss … was filed with the court and Nationwide stated in its motion for summary judgment that NNT's proof of loss was submitted to Nationwide …."); *Allstate Insurance Co. v. Charity*, 496 S.E.2d 430, 430 (Va. 1998) ("Charity … submitted a proof of loss on June 23, 1995."); *see also id.* at 431 ("The insured retains the burden to show that the information actually provided constitutes reasonable and substantial compliance with the requirement that a proof of loss be submitted to the insurer."). Another concerned delay *after* the parties had already agreed on the amount of loss (or had an appraisal to determine that amount). *Affordable Construction Services v. Church Mutual Insurance Co.*, No. 1:19-cv-1288, 2021 WL 781365, at *4 (W.D. Tenn. Mar. 1, 2021) (an obligation that arose "*after* [the insurer] receiv[ed] the sworn proof of loss") (emphasis added).

Finally, even assuming the notice provision applied, CEB hasn't pointed to evidence that would support a finding that Nationwide breached it. Nationwide learned of the loss around December 18, 2021, when it prepared a report on the loss. *See* DN 49-5. Two days later, Nationwide issued the $288,000 check. Four days after that, CEB withdrew its claim. Letter (48-4, -5) from CEB's Insurance Agent to Nationwide. CEB knew Nationwide's "intentions" to pay for the loss within a few days of CEB's initial claim, even if that intent changed following CEB's withdrawal and West Bend's payment.

CEB also requested a status update on January 24 and formally reopened its claim a week later. 2022 CEB-Nationwide Email Traffic at 4; CEB Demand Letters at 1. Nationwide responded on February 10, stating that the check from West Bend "protected" CEB's interest and asking CEB what it was "looking for on [its] claim." 2022 CEB-Nationwide Email Traffic at 1. CEB, in turn, responded with letters dated March 17 and 18, asserting its belief that Nationwide still owed it a payout.[9] CEB Demand Letters at 2–4. (Why CEB would've been entitled to an additional payout—despite having been named on the check from West Bend—is not clear from the letters.) By April 11—less than 30 days later—CEB had recovered its insurable

---

[9] CEB relied on the policy's "other insurance" clause to argue it was entitled to a pro rata share of the building's going value. CEB's MSJ at 4 n.3.

7

interest in the building. And on May 2, Nationwide sent CEB its final letter denying the reopened claim. In light of these events, the only possible delay exceeding 30 days is the time between CEB's March 17 letter and Nationwide's May 2 denial.

CEB has cited no precedent addressing the question whether a renewed demand for payment under a policy re-triggers a 30-day-notice provision like this one. The Court is skeptical that it could—at least under these circumstances. By all appearances, Nationwide timely responded throughout this dispute—fraught as it was with misunderstandings, withdrawals, and renewed demands. And during the only conceivable time that it didn't—the March to May delay—Ultimate paid CEB its full insurable interest. At that point, Nationwide's obligation under the policy dissolved, and CEB shouldn't have needed its insurer to tell it that it wouldn't receive a double payout. CEB seems to construe the notice provision as a general requirement that Nationwide respond to any request for information in a timely manner. But the policy's text, devoid of any supporting precedent or evidence, can't bear that weight.

## ORDER

The Court grants Nationwide's motion for summary judgment and denies CEB's motion for summary judgment. And because no common-law or statutory bad-faith action may proceed absent a breach, *see Davidson*, 25 S.W.3d at 100, the Court dismisses the remaining claims.